**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>FLORIDA ORGANIC AQUACULTURE, LLC.<br>EIN# 27-5555911, | Case No. 17-15012-EPK<br>Chapter 11 |
| | Jointly Administered |
| | Case No. 17-21251-EPK<br>SUSTAINABLE AQUACULTURE<br>INITIATIVE, LLC. |
| | Chapter 11 |
| _____Joint Debtors__/ | |

**RESPONSE AND OBJECTION TO**
**EMERGENCY MOTION TO IMMEDIATELY INVALIDATE**
**AUCTION AND HOLD A SECOND AUCTION WITH ONLY PROPERLY**
**QUALIFIED BIDDERS AND TO ALLOW INSPECTION OF THE LEASES PREMISES**

Comes now, Joint Debtors, FLORIDA ORGANIC AQUACULTURE, LLC. and SUSTAINABLE AQUACULTURE INITIATIVE, LLC by and through their undersigned counsel and file this Response and Objection to Emergency Motion to Immediately Invalidate Auction and Hold a Second Auction [ECF#163] and in support thereof state as follows:

**BACKGROUND**

1. Debtor, Florida Organic Aquaculture LLC ("FOA") filed for chapter 11 relief on April 24, 2017. FOA continues to operate as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (the "Code").

1

2. Debtor, Sustainable Aquaculture Initiative LLC ("SAI") filed for chapter 11 relief on September 1, 2017. SAI continues to operate as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (the "Code").

3. Debtors filed the chapter 11 proceedings in order to preserve the going concern value of the entities, to obtain financing that would allow the Debtors to reorganize, and to protect the EB5 Visas of the foreign investors who had invested $500,000 each into the Debtors.

4. Debtor FOA attempted to secure financing or investment dollars to fund a reorganization on its own for the first few months of the case, and then, in order to preserve the going concern value for the benefit of creditors, opted to hire an outside broker to facilitate with obtaining financing or to sell the assets as a going concern.

5. On July 19, 2017, FOA filed a motion to employ financing consultant and sales broker, Hank Waida of Equity Partners. (See ECF#45, lead case)

6. FOA selected Equity Partners as its broker based on Equity Partners' reputation and experience in the industry, specifically seeking an auctioneer who could maximize the value of the Debtor estates as going concerns. Equity Partners has been operating in the distressed mergers and acquisitions and auction industry since 1988. They have conducted more than 500 distressed going concern sales around the U.S., mostly ending in auctions of the going concern entity. They have obtained approval of approximately 250 § 363 sales by 67 independent bankruptcy courts. No auction conducted by Equity Partners has previously been denied or vacated by a court. This engagement was led by Managing Director, Hank Waida, and Senior Managing Director, Ken Mann. Mr. Mann has been with the firm for 23 years and was involved in more than half of those cases. Mr. Mann is a regular speaker on the topics of bid procedures

2

and maximizing value in an asset sale for such groups as the American Bankruptcy Institute, the Turnaround Management Association, the Florida Bar, the Mississippi Bankruptcy Conference, and he has been an author on these topics for various lender, attorney, crisis manager oriented trade publications. Mr. Waida has led more than 80 engagements in his more than 12 years with the firm, and has conducted numerous 363 auctions. Equity Partners HG is a wholly owned subsidiary of Heritage Global, the founders of which have conducted more than 5,000 auctions around the world.

7. Movant, Fellsmere Joint Venture, LLC ("FJV") who is both the joint Debtors' landlord and bid at the disputed auction, filed an objection to the broker's retention, seeking a determination that its rights to object to any transaction that would impact FJV's rights under the lease agreements be preserved.  (See ECF#52, lead case)

8. After concluding that that it would not be able to obtain financing or an investor to fund the Debtor FOA's on-going operations within a reasonable timeframe, Debtors FOA and SAI filed motions seeking to establish bid procedures for an auction of substantially all assets of the Joint Debtors.[1]  (See ECF# 98, lead case, and ECF#11 in the SAI case)

9. The SAI case was filed in large part based on concerns that FJV would refuse to allow assignment of the leases outside of the confines of § 365 of the Bankruptcy Code.

10. Upon request of creditors in the SAI case, and to promote uniformity in the bid procedures, an Amended Order was entered on October 2, 2017, that established revised bid procedures applicable to both cases.  (See ECF#153, lead case, incorporating by reference the bid procedures attached as Exhibit A to ECF#11 in the SAI case)

---

[1] Separate motions were filed by the Debtors prior to administratively consolidating the two cases.

11. The Amended Order on the Bid Procedures established an auction date of October 11, 2017, and required that final bids be submitted no later than October 3, 2017. These bidders were required to "qualify" by following guidelines established in paragraph B of the Bid Procedures. (See ECF#153 lead case, and ECF#11, Exhibit A in the SAI Case)

12. On September 25, 2017, Creditor Helen Ming contacted Debtors' counsel and explained that she had just received a substantial package of forwarded mail, as the address listed for her on the mailing matrix was a prior address and needed to be updated. Included in the forwarded mail was the Debtor FOA's Plan and Disclosure Statement, Orders relating to the retention of Equity Partners, and Orders relating to the upcoming auction.

13. During this conversation, Debtor's counsel informed Ms. Ming that she would update her address for future mailings, and told her to watch out for a revised order on the bid procedures, establishing new deadlines to submit bids and a new auction date. At that time, the September 27 hearing on the Motions to reconsider the bid procedures was pending, and it was agreed that the auction date and bid deadline would be postponed.

14. On September 28, Debtors' Counsel uploaded the Amended Order Establishing the Bid Procedures with the new timelines. On October 2, that Order was entered and was mailed to Ms. Ming at her new address, in New Jersey. Ms. Ming did not receive notice of the October 3 final bid deadline in time to submit a qualifying bid under the established bid procedures.

15. An attorney purporting to represent several of the Chinese EB5 Investors, phoned Debtors' counsel the night before the auction and indicated that the Investors had received notice of the upcoming auction that day and indicated his concern that the auction would deprive the investors of the right to bid on the assets themselves, in order to protect their investments and the

green cards obtained by way of those investments. Counsel for the Debtors informed this attorney that he could raise an objection to the auction at the sale hearing to protect his clients' due process rights, and provided him with access to the Court Call procedures.

16. Ms. Ming also contacted Mr. Morris, the Debtor's principal, the night before the auction and offered to invest money to fund the Debtor's reorganization. Mr. Morris informed Ms. Ming that it was too late for her to invest in the Joint Debtors, but suggested she contact Equity Partners to see if she could become a qualified bidder to purchase the assets of the Joint Debtors for the benefit of her investors.

17. The morning of the auction, Ms. Ming contacted Equity Partners and asked to be included in the auction, stating that she was authorized to bid on behalf of Chinese investors. Prior to the auction, Ms. Ming provided Equity Partners with 7 authorization letters from investors giving her authority to bid on their behalf; she provided proof of personal liquidity in the amount of $187,938; she provided evidence that she had wired ½ of the required bid deposit to Equity Partners with a commitment that the second half would be wired immediately after the auction[2]; she indicated that she would be bidding on all assets of FAO and SAI (bid lots 1 and 2) including the right to assume or reject leases, with additional interest in the smaller bid lots; she also indicated that she would form an entity immediately after the auction for the purpose of acquiring the assets with the goal of maintain the going concern (under a new entity) and preserving the visas of the 36 individuals who invested in the Debtors.[3]

---

[2] Ms. Ming indicated that her bank would not allow on-line authorization of a wire larger than $50,000, and she was unable to personally go to the bank because the auction was taking place within the hour. After the auction, the other $50,000 was wired immediately.

[3] The 49% shareholder of FOA is Mirzam Green Card Partners 1 – this entity contains the 36 investors and is the entity that must survive, as an investor in an operation with substantially the same operation as FOA, in order for the investors to retain their green cards. FOA need not survive the liquidation, but Mirzam Green Card Partners 1 must hold an interest in the acquiring entity to for the green cards to remain in-tact.

18. Mr. Mann and Ms. Ming had numerous calls in the hours leading up to the auction to make sure she understood the rules, was prepared to bid without contingencies, understood it was an asset sale, would commit the cash required to cure all lease deficiencies, knew the timing of closing, and so forth. Based on these circumstances, the bid deadline was extended for this group as allowed for in Section D. <u>Deadline for Submission of Bid Proposals</u> of the approved Sale Procedures that states "*The Proposal Deadline may be extended in the sole discretion of the seller, in conjunction with the Broker.*"

19. Despite heavy marketing attempts, only two bidders submitted final bids and appeared at the auction. On information and belief, one of the bidders wished to bid only on the assets of SAI, leaving only one interested bidder in the assets of FOA – the landlord FJV. Other bidders had expressed interest, and one highly qualified bidder submitted a written letter stating that they would not proceed with the bid due to concerns that the Landlord would not allow lease assumption or assignment.

20. Between 8 am and 10 am, when the auction commenced, Equity Partners – represented by Ken Mann and Hank Waida; Debtor's counsel along with the Debtor's Principal; and the attorneys for the primary secured creditors of FOA and SAI reviewed the submissions presented by Ms. Ming and determined that she could qualify as a late bidder and should be allowed to participate in the auction. Mr. Morris represented that he had recently been in communication with Mr. Xu Qiu, one of the investors who committed to support Ms. Ming's bid, and had seen recent evidence of Mr. Qiu's net worth of several million dollars, and had personally seen statements evidencing current liquidity of approximately $1M. Each of the investors who provided authorization letters had already invested $500,000, and thus stood to

6

lose $3.5M combined, in addition to the loss of their green cards, and thus had a substantial stake in ensuring that the sale closed and the operation continued under a new entity.

21. Based on the evidence presented prior to the auction commencing, it appeared that Ming stood on equal ground with the other two qualified bidders with regard to ability to close on the transaction. It was the belief of the Debtor, Equity Partners and Counsel for the Secured Creditors that Ms. Ming's investor group had the financial wherewithal to close on the sale, and that based on the delayed notice to Ms. Ming of the final bid deadline, and alleged lack of notice (according to Mr. Gordon) to the investors themselves, that equity and the best interests of creditors supported a determination that Ms. Ming was a qualified bidder as provided in paragraph 5 of § B. Bid Proposals of the approved Bid Procedures – "*[t]he Broker in consultation with the Seller shall have the right to determine the adequacy of the foregoing information and documents*" – which pertains to the APA and evidence of financial ability to close.

22. It was understood that Ms. Ming would be participating in the auction, on behalf of the group of investors, under "*Helen Ming or her assigns, probably an entity to be formed.*" In Equity Partners experience, it has been common for bidders to participate in auctions in this manner rather than spending the funds to form an entity, and dealing with the related nuisances, prior to knowing if they are the winning bidder or not.

23. During the auction, the bids split with FJV bidding on the assets of FOA, and the alternate bidder Primo Broodstock, bidding on the assets of SAI. FJV submitted a backup bid of $800,000 for the assets of both entities, but was primarily focused on bidding on the assets of FOA, leaving Primo Broodstock to bid on the assets of SAI. The starting bids by FJV and Primo

7

were $350,00 and $250,000 respectively. Ms. Ming bid on the assets of both entities on behalf of her investor group. Her final bid was $1,890,000; consisting of $1,850,000 for the assets of FOA and SAI subject to blanket liens, plus another $40,000 for equipment subject to equipment financing agreements.

24. Since the auction, Ms. Ming's group has taken steps to form an entity called NS FOA LLC; hired bankruptcy counsel, Aaron Wernick Esquire, to represent her group in moving forward; and provided the full $285,000 deposit representing 15% of her bid.

25. Based on these facts, and for the reasons set forth below, the landlord's motion should be denied.

## ARGUMENT

### A. Ming was a qualified bidder

26. Seller and Equity Partners had discretion to extend the bid deadlines to allow Ms. Ming to qualify per Section D. Deadline for Submission of Bid Proposals of the approved Bid Procedures that state "*[t]he Proposal Deadline may be extended in the sole discretion of the seller, in conjunction with the Broker.*"

27. Seller and Equity Partners had discretion to determine the adequacy of evidence of financial ability to close and the bidders' proposal for the assets to be purchased per paragraph 5 of § B. Bid Proposals of the approved Bid Procedures – "*[t]he Broker in consultation with the Seller shall have the right to determine the adequacy of the foregoing information and documents*" – which pertains to the APA and evidence of financial ability to close.

28.	It is the Debtor and its Professionals' fiduciary responsibility to maximize the value of the sale for the benefit of the estate. The Bid Procedures approved by the Court afford the Seller the flexibility to do so.

29.	Based on the facts set forth above, Seller and Equity Partners had a clear understanding of the assets sought to be purchased by Ming, disclosure of the identifies of at least 7 investors who had clearly authorized her to bid on their behalf, knowledge of the financial wherewithal of Ming and at least one committed investor who had evidenced the ability to close on the sale, and were able to make a determination that Ming qualified to bid prior to the auction with the understanding that she would form and fund an entity for the purpose of acquiring the assets.

30.	Ming was not a Phantom Bidder, participating in the auction for the purpose of artificially inflating the bid. Seller, Brokers and Secured Creditors had every reason to believe that Ms. Ming possessed the motivation and ability to close on the sale.

**B. Approval of Ming's bid is in the best interest of creditors of the bankruptcy estate**

31.	Absent Ming's bid, the auction will be held between two bidder who may carve-up the assets with no genuine competition between them.

32.	There is no prejudice to the creditors of the bankruptcy estate from allowing Ms. Ming's bid to stand.

33.	Ms. Ming's participation in the auction and high bid resulted in an outcome that allowed for a $50,000 carve-out for general unsecured claims.

34. The only Creditor opposed to the auction is FJV, who has created every obstacle for the Debtor to assume and assign the leases, and whose intent seems to be solely to recover possession of the leased premises, fixtures and improvements at the lowest cost possible.

35. FJV stands in a unique position, as assumption of the leases will require that the Landlord is not impaired and is made whole by the assignee.

36. The Court has set an evidentiary hearing on the issues of Ming's ability to cure the lease defaults and provide adequate assurance of future performance. This Motion is an attempt to circumvent that process, such that the Landlord can acquire the assets of FOA at a rock bottom price and retake possession of the leased premises. Stifling competition is the primary objective of requiring a second auction and not allowing Ms. Ming's group to participate in the auction.

**C. There is no "cause" to appoint a chapter 11 trustee or convert the cases to chapter 7**

37. FJV's accusations that Mr. Morris has or will abscond with estate property are unfounded.

38. On the day that the FJV employee sought to inspect the property without any prior notice or request, Mr. Morris was present at an on-site meeting with Ms. Ming and all employees of the Joint Debtors to discuss the funding needs of the Joint Debtors during the period between the auction and the closing.

39. Debtors have not used any portion of the Ming deposit to maintain the going-concern value of the Debtors and would not do so without authorization of the Court.

40. Mr. Morris has been working with Ms. Ming to establish a funding mechanism until the sale closes to preserve the going concern value of the Joint Debtor.

10

41. Mr. Morris will have no connection with the operation going forward aside from providing support during the transition phase, and seeks no personal financial gain from the estate's transaction with Ms. Ming. His only stake in the outcome of the auction is the desire to protect the EB5 Visas of the investors. Accordingly, on the day of the meeting with Ms. Ming, he packed up his office and removed his personal effects from the property.

42. Mr. Morris would stipulate that no property was nor will be removed from the premises other than his personal effects, and property being recovered by creditors that was not sold at the auction (for example, Star Capital's collateral, which was purchased by Star Capital as a Credit Bid; and equipment subject to a written lease agreement with Terramar Development, such lease not being requested for assumption or assignment by any bidder).

43. FJV has requested access to inspect the property on several occasions during this case, and that request has been granted. Per the lease terms, FJV is required to provide the Debtor with reasonable notice of the inspection so that the Debtor can make the appropriate arrangements. The Debtor has not violated these lease terms and will provide the Landlord with the right to inspect the premises after arrangements are made per the lease terms.

44. Converting to a chapter 7 or appointing a chapter 11 trustee at this phase, when the Debtors' assets are already being liquidated, will only add administrative expenses and lead to an administratively insolvent estate.

**WHEREFORE**, Debtors, Florida Organic Aquaculture, LLC and Sustainable Aquaculture Initiative LLC respectfully request that this Court enter an order denying the Creditor's motion to invalidate the auction and for such and other relief as this court deems appropriate.

I HEREBY CERTIFY that the foregoing Response and Objection to Response and Objection to Emergency Motion to Immediately Invalidate Auction and Hold a Second Auction has been forwarded this 17th day of October, 2017 by U.S. Mail or Electronic Mail as set forth on the Service List listed below.

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

> MARKARIAN FRANK & HAYES
> 2925 PGA Blvd., #204
> Palm Beach Gardens, FL  33410
> (561) 626-4700
> (561) 627-9479-fax
>
> By:     /s/ *Malinda L. Hayes*
> MALINDA L. HAYES, ESQ.
> Florida Bar No. 0073503

## SERVICE LIST

**Copy provided by electronic mail to:**
Michael R. Bakst, Esq. on behalf of Creditor Stonehenge Community Development LXXV, Stonehenge Community Development LXV and Stonehenge Capital Company, LLC
efileu1094@gmlaw.com,
FL65@ecfcbis.com;efileu1092@gmlaw.com;efileu1093@gmlaw.com;melissa.bird@gmlaw.com;efileu2170@gmlaw.com

Ronald M Emanuel, Esq on behalf of Creditor U.S. Bank National Association d/b/a U.S. Bank Equipment Finance
ron.emanuel@emzwlaw.com, leslie.marin@emzwlaw.com

John D Emmanuel, Esq on behalf of Creditor First Home Bank
John.emmanuel@bipc.com, Sabrina.storno@bipc.com

John D Emmanuel, Esq on behalf of Creditor First Home Bank
John.emmanuel@bipc.com, Sabrina.storno@bipc.com

Malinda L Hayes, Esq. on behalf of Debtor Florida Organic Aquaculture, LLC
malinda@businessmindedlawfirm.com, mlhbnk@gmail.com

Malinda L Hayes, Esq. on behalf of Debtor Sustainable Aquaculture Initiative LLC
malinda@businessmindedlawfirm.com, mlhbnk@gmail.com

Malinda L Hayes, Esq. on behalf of Interested Party Sustainable Aquaculture Initiative LLC
malinda@businessmindedlawfirm.com, mlhbnk@gmail.com

Dana L Kaplan on behalf of Creditor Captive Capital Corporation
dana@kelleylawoffice.com,
lyndia@kelleylawoffice.com;tina@kelleylawoffice.com;craig@kelleylawoffice.com;Caitlin@kelleylawoffice.com

Dana L Kaplan on behalf of Creditor Star Capital Group L.P.
dana@kelleylawoffice.com,
lyndia@kelleylawoffice.com;tina@kelleylawoffice.com;craig@kelleylawoffice.com;Caitlin@kelleylawoffice.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Joel C Zwemer on behalf of Creditor Fellsmere Joint Venture LLC
jzwemer@deanmead.com

Eric B Zwiebel, Esq on behalf of Creditor Direct Capital Corporation
eric.zwiebel@emzwlaw.com, eservice@emzwlaw.com

**NOTICE WILL BE PROVIDED VIA US MAIL TO ALL CREDITORS ON THE MAILING MATRIX AND A SEPARATE CERTIFICATE OF SERVICE FILED**

X:\WPDOCS\Client Matters\Florida Organic Aquaculture (Cliff Morris)\Chapter 11\Pleadings\Response and Objection.Motion for Relief from Stay.US Bank.docx